## Turner v. Shropshire.

Jan. 24, 1941.

C. B. Wheeler for appellant.

J. W. Howard for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Appellee, in March 1936, filed her petition making appellant and J. B. Smiles, a merchant in Prestonsburg, defendants, seeking recovery for injuries caused by having been bitten by a dog harbored by Mrs. Turner on her premises some distance from the store, and on which was a garage rented to Smiles.

On December 13, 1935, Smiles made out a check to

Mrs. Turner for the rent and directed appellee, his employee, to deliver the check. In her petition she alleges that she knocked at the front door of appellant's home and receiving no response, followed a walk to the rear of the premises in order to deliver the check. Before reaching the rear door she was attacked by a German Police or Shepherd dog, chained to a pillar of the rear porch, and according to undisputed evidence was severely wounded and injured.

The charge aimed at Smiles was that at the time he sent appellee on her mission, he knowing of the presence of the vicious dog, a fact unknown at the time to appellee, failed to warn her of the dog's reputation. The petition was later dismissed as to Smiles. As to Mrs. Turner, it was charged that she was at the time knowingly harboring a vicious and dangerous dog in her back yard where it could reach persons who might enter the premises and do injury. Appellee sought $5,000 for injuries and $150 for necessary medical and hospital bills.

Appellant denying the allegations of the petition, affirmatively plead nonownership; that the dog had been brought to her home by a kinsman who lived with her until 1934, when he died. While living he cared for and trained the dog, which was of a kind disposition, "to watch and protect the property and give warning to the occupants of the presence of unauthorized persons." She said she had qualified as administratrix of her kinsman's estate, and the dog came to her along with other assets, and she was holding him in the capacity of personal representative.

She described how she kept the dog chained to a pillar in the rear yard—the chain being only about 10 feet long— to keep him from straying, and for the purpose of notice to unauthorized strangers; its "barking most always causing trespassers to leave," and she places appellee in the class of a trespasser. She charged that her front door was the proper entrance for visitors or persons having business with her, and that the rear door was for her private use, and plaintiff had no permission to use the rear entrance; she fails to charge that appellee had knowledge of such rules.

She then says that plaintiff approached the rear door in a reckless, careless and negligent manner, with-

out notice to the dog, and suddenly ran upon him, "thus causing him to become excited and to bite her," hence guilty of such contributory negligence as brought about her alleged injury. The answer was controverted of record. Upon submission a jury awarded appellee $1,000, for which judgment was entered. Motion for a new trial was overruled, and on appeal appellant insists:

(1) The court erroneously refused to grant a continuance on the ground of absence of a witness.

(2) The court should have granted a new trial, because of the death of the official reporter before having time to transcribe the testimony, thus preventing appellant from securing and filing an accurate bill of exceptions.

(3) The court should have sustained appellant's motion for a peremptory instruction.

(4) The instructions given were erroneous, and did not properly present the issues.

(5) The jury was guilty of prejudicial misconduct.

We shall first consider appellee's motion to strike what is termed a purported bill of exceptions. On May 29 motion for a new trial was passed until October; the court overruled it and gave defendant until the last day of the January 1938 term to file. There is in supplemental transcript a narrative form of bill, prepared by counsel for defendant, filed within time. There is also in the record an agreement by appellee's counsel that no question as to time of filing would be raised, provided a "bill be actually prepared and tendered not later than March 14, 1938," thus waiving question as to time. Counsel for plaintiff later moved to strike the tendered bill, and the court later sustained the motion, though permitting the draft to remain in the files for appeal purposes. The court then prepared, approved and ordered filed a bill of exceptions, which we have examined together with the one prepared by counsel, finding little material difference. The court overruled objection to the filing of the later bill.

At this point it may be said that a few days after the official reporter had taken the testimony, he met death in an automobile accident, and it was asserted

that no other person could transcribe the notes, thus leaving defendant in a position where in order to get the benefit of the testimony she was relegated to the filing of a bystander's bill, or a narrative bill, which latter course was chosen. Counsel admits that his motion for a new trial, based on the stated ground, is not of great merit, and we agree.

Section 335 of the Civil Code of Practice provides "no particular form of exception, or bill of exceptions is required." It is not essential that the complaining party take advantage of the stenographer's notes in presenting his bill; "if he desires he may give the evidence in narrative form and take his chances on its approval by the court. If he does not approve it, it is his duty to correct it, or suggest the corrections and sign it." This is the method pursued in this case.

"The bill of exceptions with the evidence in the narrative form was filed within the extended time at the succeeding term of the court. The court did not approve at that time, but took time to correct the bill of evidence. * * * the rule is that, if the bill of exceptions be tendered in time, the trial judge may correct any inaccuracy and file it as corrected, even after the expiration of the original time fixed for its tender." Oliver v. Muncy, 271 Ky. 15, 111 S. W. (2d) 392, 393, which, with the case therein cited, is conclusive against the contention here.

The court correctly overruled appellant's motion for a directed verdict. The proof was amply sufficient to authorize submission.

The dog, according to defendant, was kept chained to a brick pillar at some point in the rear yard. There is no definite evidence as to the length of the chain; some say 10 feet, others 12. This is immaterial, since it is undisputed that when appellee turned the corner of the house, and before stepping onto the back porch, the dog attacked her. He bit pieces out of her leg and arm. She endeavored to fight him off and get on her feet, but the dog continued to attack with the result that, as testified by her and the attending physician, there were approximately thirty distinct wounds on various parts of her body.

Witness testified, and it is not denied, that when she

went to the home she did not know of the presence of the dog. Her first knowledge was when he made the attack. She tells of her suffering; the treatment accorded by her local physician, and also in the hospital.

That the dog was vicious and dangerous was amply proven, as was appellant's knowledge of its characteristics. Dr. Stephens, who had been to appellant's home frequently, said the dog had been chained at times so as to give him range of the front yard; that on occasions he had rushed at him in a vicious manner, straining at his bonds. "Any stranger entering the yard had to be very cautious, as this dog always appeared ready to attack any one who entered the yard."

Copeland read the meter at appellant's home monthly; this duty required him to go on the back porch. In December 1935 he went around the rear to read the meter and the dog attacked and bit him severely. He said, "I always encountered trouble when I went to read the meter. I called this to the attention of Mrs. Turner, and showed her where the dog had bitten me. After that time I refused to go around the house, and she let me go through the front way." The attack on appellee was several weeks after the attack on Copeland.

Ballard Johnson says that while making water pipe repairs on an adjacent property, and while his back was turned, the dog got loose and attacked him. He had a pipe wrench and succeeded in fighting him off; "he appeared to be very vicious." Bill Brown, who lived across the street from Mrs. Turner's home, said the dog was "vicious and no stranger could enter the front yard without having trouble with him. He always wanted to attack some one."

The same character of evidence as to the viciousness of the dog was related by others; a man who delivered papers and boys helping him had so much trouble with the dog that they ceased to deliver papers, "the boys would not venture in the yard. I told Mrs. Turner I would not be able to make deliveries of papers while she kept the dog in the yard. She did not make any other arrangement, so I quit making further deliveries."

Appellant testifying tells how she came to have the dog, which was left there after her nephew's death. She did not know plaintiff was on the premises; she

heard no one knock. She kept the dog for protection, and while saying she never knew of his harming any one, admits that Copeland had told her of having been bitten by the dog. Several witnesses testified that the dog was not of a vicious disposition, and as one says, "there was no danger if one does not approach suddenly without the dog's knowledge of their presence." One witness who so testified had sold it to the nephew and he says that "naturally he knew me when he saw me about the place." A niece gave the dog a good reputation, but she lived on the premises and says, "I was accustomed to feed the dog."

A grocery boy who made frequent deliveries to the home of appellant said the dog was chained by a long chain which would reach the corner of the house. He gave the dog a clean bill, but said:

"I got him to take up with me; when I first started going there I would give him things to eat, * * *. That is the way I never had any serious trouble with the dog."

From the recital given above it can be readily gathered that appellant was knowingly harboring a vicious dog. She insists that appellee was a trespasser and should not have gone to the rear door; that it was her duty to deliver the check by means of the front door. There was no sign warning persons whose duties might take them to the rear, of the presence of a vicious dog. It is not claimed that appellee had ever before been on the premises, or that by any means was warned, or had knowledge of the presence of the dog on the premises. We suggest these points because it is insisted here that the young lady in attempting to carry out her employer's command was a trespasser.

The contention that the court erred in refusing continuance is not well taken. The motion was made on a day after the trial was begun. There was no objection to the court's ruling or to his refusal to let affidavit be filed, therefore there was waiver. Theobold v. Heileman, 263 Ky. 493, 92 S. W. (2d) 802. The ground for continuance was that a witness who lived in Prestonsburg, who affiant "understood" was in the city, had failed to respond to subpoena. Facts which affiant said might be proven, although it was not stated that such would be, or were believed to be true, were to the effect

that absent witness would state he lived as an adjoining neighbor to appellant, and was well acquainted with the dog. He rented defendant's garage, and was on the place frequently. He knew the dog, "talked to and played with him frequently," and would occasionally feed him, and the dog was not vicious, but friendly. Laying aside the technical reasons why continuance was properly denied, it is quite obvious that Patton's evidence would have been merely cumulative, and would have tended to show that because of his frequent contact with the dog, he was friendly toward him. This would throw no light on the question of the dog's attitude toward strangers.

As to complaint of failure to give, and in giving improper instructions, little need be said. The action here, since we now have no statute on the subject (Brown v. Weathers, 247 Ky. 306, 57 S. W. (2d) 4), was based on the common-law rule that one who knowingly harbors a vicious dog is liable to a person injured. Under that law it is established in this, and many jurisdictions, that a person who knowingly harbors a vicious animal is liable for injury resulting to others, irrespective of negligence, the liability being based on the theory that knowingly harboring constitutes a nuisance. Brown v. Weathers, supra, and notes to Krebs v. Hermann, 79 A. L. R. 1054; Fowler v. Helck, 278 Ky. 361, 128 S. W. (2d) 564.

Complaint is made that the court refused appellant's tendered instruction that if appellant had possession of, and kept the dog as part of the assets of her nephew's estate, she was not to be held liable. This contention is fully answered in Davidson v. Manning, 168 Ky. 288, 181 S. W. 1111.

Another instruction offered by appellant told the jury that if appellant had the dog confined at the time, and plaintiff entered her premises and went to the back of the dwelling without defendant's consent instead of entering the front, the jury should find for defendant.

The instruction was properly rejected. In the first place if appellant knew the dog was vicious, of which fact there is little doubt, she owed the duty to see that it was not in such a place as it might attack persons who were lawfully on her premises, and the proof shows that the rear of the premises was frequented by a por-

tion of the public, not particularly at the invitation of the owner.

The court instructed the jury that if it should believe from the evidence that appellee at the time complained of was bitten by a dog harbored by the defendant, and further that the dog was of a known vicious nature, they should find for the plaintiff, but unless they so believed they should find for the defendant. Counsel contends that under this instruction the jury was not allowed to consider the "conduct of the plaintiff tending to bring about said injury." That "she could have brought about the injury by any unlawful conduct of her own by teasing and tantalizing the dog, yet the jury could not consider her conduct at all, but had to find for her if the dog was known to be of a vicious nature." The answer to the argument thus far is that there is no pleading that would justify such an instruction, and assuredly an absence of proof which would least tend to show that plaintiff was tantalizing the dog. Her proof as to what occurred is not denied by any testimony we have been able to find.

Appellee was on a lawful mission, undertaking the bidding of her master, openly and in the daytime. She was in no sense a trespasser; she occupied the position of either licensee or invitee; we need not determine her exact status. The proof clearly shows that the rear premises were regularly used by the newsboys, plumber, meter-reader, renters of the garage, and the grocery boy. Since the action here was based on the common law relating to liability for injury by a vicious animal, we think the instruction as given followed the law. See Brown v. Weathers, 247 Ky. 306, 57 S. W. (2d) 4, and other cases cited in Section 70, Stanley's Instructions.

The final contention is the alleged misconduct of the jury. During the trial, on motion of appellant, the jury was sent to the premises, accompanied by the sheriff and counsel for each party. While there one of the jurors unwound the chain which was fastened to the pillar, stretched it in several directions, including the direction toward the corner of the house, and then stepped this distance off. When the parties returned, and trial resumed next day, no objection was raised nor motion made to set aside the swearing of the jury. Nor was this objection set up in the motion for a new trial on May 15, but was supplemental.

Counsel for appellant also filed an affidavit of Opal Turner, who lived at the home of appellant, in which she stated that during the trial, and after the entire jury had examined the premises, three jurymen returned to the premises, and one said he was not satisfied about that chain; "why it wouldn't come to that gate." She said she and appellant talked to them. It was fairly well developed that the three referred to by Miss Turner were three who were slow in following the other members to the street. The sheriff in charge said that all the jurors started out to the street with him, and a rain came up and the jury became scattered looking for shelter. This occurred, according to the sheriff, after the jury had been discharged for the day, with instructions to return the next morning. As a practical proposition, the conduct of the whole jury or the three jurymen could not be conceived to have operated to the prejudice of appellant. She and Opal Turner were on the ground and at least one of them conversed with a member of the party, and it is not likely anything was said to the disadvantage of appellant.

The original motion did not contain a charge of misconduct of the jury, and the later supplemental ground was not based on misconduct, except in specification that the entire panel had measured the chain. The other misconduct was not specifically set up as a ground, and the affidavit in support was not filed until June 9. The delay is not satisfactorily accounted for, as it should have been, since the knowledge of the visit of the three was most assuredly in the possession of appellant before submission. This being true, it was the duty of appellant to inform counsel so he might have made timely objection, and moved for a setting aside the swearing of the jury. Drake v. Drake, 107 Ky. 32, 52 S. W. 846, 21 Ky. Law Rep. 636; Murphy v. Com., 263 Ky. 347, 92 S. W. (2d) 342, and cases cited.

Aside from the technical rule, it is apparent that if the jury did measure the chain or comment on its length, the outstanding fact is that the proof shows it was of sufficient length at the time to permit the dog to make the attack before appellee had reached the back door; there is no proof to the contrary.

We fail to find error and hence must and do affirm the judgment.